FEINBERG, Plaintiff-Appellee, v. BEREAL HOTEL CO.,
Defendant-Appellant.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 21076. Decided January 10, 1949.

Coleman Kiss, Cleveland, for plaintiff-appellee.
Hauxhurst, Inglis, Sharp & Cull, Cleveland, for defendant-
appellant.

(MONTGOMERY, J, of the 5th Appellate District sitting by
designation in place of MORGAN, J.)

## OPINION

By SKEEL, J.

This appeal is on questions of law from a judgment for the plaintiff entered in the Common Pleas Court of Cuyahoga County.

The plaintiff was an Express man who was engaged by the United Cork Company to carry a refrigerator door from the Olmsted Hotel to the Cork Company's place of business. The door, which weighed about two hundred and sixty-four pounds was in the first basement of the hotel, at which place the Cork Company was engaged in installing a refrigerator unit in the hotel. A Cork Company employee and the plaintiff, with the permission of an engineer in the employ of the defendant, put the door on a sidewalk elevator which extends from the sub-basement of the hotel to the sidewalk level in East 9th Street, a distance of about seventeen feet, the loading platform of such elevator then being at the first basement floor level which is about eight or nine feet below the sidewalk level.

The floor or platform of the elevator is five feet wide and forty-two inches deep. There is a U-beam extending up from each side of the elevator and over the top which guides it in the side tracks and opens the sidewalk doors, the distance from the floor of the elevator to the center of the arch or center of the U-beam being 6′ 6″. The door which was being taken to the sidewalk level was 6′ 5″ x 46″ according to the elevator inspector and 6′ 6″ x 46″ according to defendant's expert witness. There is a metal guard 24″ high on each end of the elevator platform. At the top of the elevator shaft, just under the sidewalk there were two metal plates on each side in which the wheels or sheaves were held, over which the chains and cables were operated to raise and lower the elevator. A lifting chain was fastened to each of the four corners of the elevator platform and passed over a sheave set in the sheave beam or plate at the top of the shaft and then this chain passed to a center sheave where the two chains on each side are joined together and fastened to a wire cable that extends downward and is fastened to drums,.

one on each side that work in unison, powered by an electric motor.

The amended petition of the plaintiff alleges that he and the employee of the United Cork Company placed said door on the elevator and started the said elevator upward and when they reached a point about three feet from the sidewalk, without warning, the elevator fell to the bottom of the shaft whereby the plaintiff was injured. The plaintiff then alleges "that said accident and all of his injuries and damages were proximately produced, caused and brought about by reason of the defective maintenances by the defendant of its freight elevator, and which it invited the plaintiff to use" * * *.

The defendant's answer admits plaintiff was injured on an elevator appertenant to the use of its premises occupied by it in its operation of the Olmsted Hotel, but denies the extent of the injuries as claimed by the plaintiff or that the injuries were the proximate result of any fault or negligence on its part and generally denies all of the other allegations of the plaintiff's amended petition.

The employee of the United Cork Company testified as to how the accident occurred as follows:

"Q. Tell us how you and Mr. Feinberg loaded this door on the elevator.

A. It was laying in the entrance to the elevator. We set it up against the U-beam so there was a clearance on all sides and in front.

Q. With respect to the portion that was on the floor of the elevator, I will ask you whether or not there was a clearance between the edge of the door and the platform.

A. You mean clearance between the—

Q. Describe the clearance all the way around.

A. It was approximately six inches from the base of the door to the edge of the elevator, to the outward entrance, and on the top it was all clear because the head of the door—

Q. What do you mean by the head of the door?

A. The top of the door.

Q. Continue.

A. —was below the frame of the U-beam, in other words, the door was—

Q. As you loaded it, the top of the door didn't extend beyond the U-beam?

A. No, it couldn't; otherwise it would go out of the shaft.

Q. What is the fact whether there was clearance on both sides of the elevator?

A. The proximate width of this type of door, it was a two-foot door, it would be approximately two feet six inches wide, and the elevator is approximately six or seven feet wide.

Q. Did you have the door in the center of the elevator?

A. In the center of the U-beam.

Q. Where did you stand in the elevator?

A. We stood on either side and held the door, so it couldn't slide or move.

Q. Who started the elevator?

A. I did.

Q. How did you start the elevator?

A. By pulling the cable alongside the door at the same time.

Q. Tell in your own words what happened from that time on.

A. We were ascending, and we got up as far as, oh, the center of my chest above the sidewalk (indicating). The door was already open, and all of a sudden we went to the bottom.

Q. When you say "all of a sudden we went to the bottom," do you mean the elevator fell?

A. The elevator fell and left us in midair, approximately half way down the shaft, till we caught up with it. Then it crashed at the bottom. The platform of the elevator was on a downward slope. There was no springs under it, and it bent the platform out of shape when it struck.

Q. Did the elevator go down fast and land with great force?

A. Very fast.

Q. Where did it come to a stop?

A. At the pit of the elevator shaft.

Q. Is there more than one basement in the Hotel Olmsted?

A. Oh, yes. There's the first basement, then the sub-basement, and then the extreme sub-basement, where the furnace room is.

Q. At which level did the elevator come to a stop?

A. At the pit, the extreme bottom.

Q. The bottom of the shaft?

A. Yes."

* * *

"Q. Did you make any observation after the elevator came to a stop, as to whether any part of it was broken?

A. Oh, I saw the cable hanging over; I didn't know whether or not it was broken. That's all I saw about the elevator."

The plaintiff testified:

"Q. Describe the manner in which the door was put on the elevator.

A. The elevator has a platform; it has a U-beam that comes up like that (indicating), kind of bell-shaped. We took this door and put the top near the top, and the bottom on the edge of the platform, gave it a slant like that (indicating); then we noticed it was below the top of the U-beam; everything was in the clear; then George drew the cable.

Q. When the door was placed in the elevator, how far from the bottom was the edge of the door?

A. About two inches.

Q. Was there a clearance on the sides?

A. Yes, sir.

Q. Did you then get on the elevator?

A. Yes, sir.

Q. Did George Little get on the elevator?

A. Yes.

Q. What was done then?

A. He stood on one side, I stood on the other, and he pulled the cable.

Q. Did the elevator start up?

A. Yes.

Q. Tell us what happened.

A. When it got up about to my chest, I could see over the sidewalk, and before we knew it, down it went.

Q. What happened to you?

A. It would be hard to say. Before I knew it, I was on the bottom. I looked at George; I tried to get up, but couldn't."

With the foregoing evidence on the issues of fact as to the defendant's failure of duty to the plaintiff, the plaintiff rested his case. His claim is that the doctrine of res ipsa loquitur is applicable to the facts by him established which is sufficient to carry the case to the jury.

The defendant called an expert witness and the city elevator inspector who examined the premises, the elevator and the refrigerator door after the accident had happened.

The expert, after giving the measurements of the distance which the elevator could travel from sidewalk level to the bottom basement level as 15' 4", the elevator platform being 5' x 3' 6" and the refrigerator door as 6' 6" x 46", which after the accident was found to be out of shape, and after identifying a picture of the shaft and three pictures of the door, said that upon an examination of the iron beam or plate which holds the sheaves on the right hand side and at the top of the shaft there "appeared to be splinters of wood. It was white, and appeared to be wood", which he said "resembled in color and kind the spot which you have indicated at the upper part of" the refrigerator door. The witness had

previously testified that the top of the frame of the door apparently had been "damaged by sharp instrument apparently".

The elevator inspector also testified that there was a mark on the "cross-member" (referring to the steel plate above-described). His testimony was as follows:

"Q. You did make examination of that white mark in connection with your investigation to determine the cause of this elevator accident; is that right?

A. Yes, sir.

Q. Now, what if anything did you see in connection with your investigation of that white mark, to correspond with this indentation at the top of Defendants' Exhibit 4? What if anything did you see?

MR. COLEMAN KISS. I object to the leading form of this question, your honor.

THE COURT. He may answer.

MR. KISS. Exception.

Q. What did you see?

A. That shows that something had forced this upper part out of position.

Q. What about the color and material?

A. This is partly concrete in here—

Q. I mean the white mark.

A. That white mark coincided with the mark on the door.

Q. The same as the frame.

A. Wood and white enamel paint, is what we took it for.

Q. In connection with your investigation, did you measure the dimensions of the refrigerator door?

A. Yes, sir.

Q. Will you refer to your report made to the City of Cleveland, and tell us what were the measurements of the refrigerator door.

A. That included the frame and all that the door was suspended in. It was 3 feet 10 inches wide and 6 feet 5 inches high."

The witness also testified that the cables were broken when he inspected the elevator the day after the accident. The evidence also is uncontradicted that the capacity of this elevator was 2,000 pounds and that the door and the two men would not weight more than 700 pounds.

The jury returned a verdict for the plaintiff upon which judgment was entered.

The defendants' claims of error are as follows:

"1st. The doctrine of res ipsa loquitur does not apply to this case because the instrumentality causing the injury was not in the exclusive operation and control of the defendant.

2nd. Error of the court in refusing defendants' special request number three to charge before argument.

3rd. Error in the general charge on proximate cause."

From the evidence, it is perfectly clear that the breaking of the cables was the ultimate fact that caused the elevator to fall and as a result of which the plaintiff was injured. The cables and in fact the elevator in its entirety were under the management and control and were maintained by the defendants. The defendants' claim that the doctrine of res ipsa loquitur cannot come to the aid of the plaintiff under the facts in this case is because it is claimed that he was in control of the elevator at the time the cable parted causing the accident.

It is true that the plaintiff was making use of the elevator. He had loaded the door on it to have it carried to the sidewalk level. He had caused the elevator to be started in motion to accomplish his purposes. His control was limited to a temporary use of the elevator wholly within the limits of the purpose for which it was intended to be used. He could not be charged with nor did he assume control of the mechanical elements by which the elevator is operated. Elevators when used for the purposes for which they are intended and in the manner intended, do not, unless negligently maintained, fall out of control to the bottom of the shaft, nor do the cables part under their regular and proper use. The management and control and the proper maintenance of the parts of the elevator that failed and caused injury to the plaintiff were with the defendants. There is not the slightest suggestion in the plaintiff's evidence that he did anything that would contribute in the slightest degree to causing the accident. The fact that the defendant as a part of its defense introduced evidence that tends to place the blame for the breaking of the cables on the negligence of the plaintiff does not deprive the plaintiff of the right to have his case submitted to the jury.

It is not the purpose of the court to be guided to its conclusion by giving consideration to the weight that is to be given to the evidence submitted. But, the conclusions of the defendant that its expert witness' theory of the cause of the fall of the elevator shows that the plaintiff's negligence was

the sole cause is subject to some doubt. If the door was loaded onto the elevator platform as testified by plaintiff's witnesses, it would have been impossible for the door to have extended over the right side into the shaft far enough to contact the sheave beam. In fact, a door which is 46″ wide and 6′ 6″ high when standing on the elevator platform which is 60″ wide and leaning against the U-beam which extended vertically upward in the center of said elevator platform, the base of the door not being further from the U-beam than 20″ and there being on the end of the platform a 24″ guard extending the full width thereof and inside of the U-beam, it would be physically impossible under such circumstances to stand the door in such a way that it would come in contact with the sheave beam within three or four inches of the elevator track. It is also hard to visualize how the cables on both sides of the elevator could part at the same time. But, just for the purpose of considering all of the evidence in the light of the physical facts, suppose the cable on the right side were to have parted just as the elevator was starting up. The platform would, to some extent, drop to the right throwing the door into or under the beam putting additional strain on the left cable causing it to part and the elevator to fall.

In all events, these are all jury questions and in their presentation to the jury, the plaintiff is entitled to the inference that unless otherwise explained by the defendants, elevator cables do not part permitting the elevator to fall when reasonably maintained and while being properly used. The weight of authority supports this view.

In the case of **Class v. Y. W. C. A., 47 Oh Ap 128,** the plaintiff loaded some laundry onto a semi-automatic elevator on the basement level to take it to the first floor. An employee of the defendant operated the controls. When the elevator got to the first floor, the plaintiff opened the door and just as he started out, the elevator started upward throwing the plaintiff out in such a way that he fell into and to the bottom of the shaft and was seriously injured. The fact that an employee of the defendant operated the elevator was a circumstance that did not in the slightest degree effect the rights of the parties. The plaintiff assisted in the operation to the extent of opening the doors at the first floor level. The court in its opinion said:

"The evidence permits of no dispute that in its normal operation, when the car is stopped at any floor and the door is opened, the car thereafter remains stationary. According to the testimony of Class this was the way it functioned dur-

ing the six months that he had ridden on it. The record, as it stands, does not permit of any dispute that had the elevator mechanism been in normal condition the car of necessity would have been required to stand still when the door was open, and that no manipulation of the operator, or of the controller, or pushing of buttons on the upper floors, could have disturbed it in any way. The opening of the door caused the car to remain immobile because of the interruption of the controlling circuit."

so that the defendant's operator was in no way involved in conduct that contributed to the accident. The plaintiff was using the elevator in the way it was intended to be used and because of some defect within the control of the defendant, the plaintiff was injured. Under these facts, the court held the doctrine of res ipsa loquitur applied and the plaintiff was entitled to have his case presented to the jury. The court said on pages 133 and 134—

"It seems evident that although the plaintiff opened the elevator door, and was in physical charge of same, he cannot be legally deemed in possession or control of the instrumentality. The act of plaintiff in opening the elevator door did not place him in possession and control of the instrumentality. He had a right to depend upon the normal operation of this type of car which called for the same to remain immobile while the door was open.

In our opinion a clear case for the application of the doctrine of res ipsa loquitur is presented, and it follows that the trial court was in error when it directed a verdict for the defendant."

The rule is well stated in 9 Ruling Case Law, 1259 as follows:

"Where that which causes an injury is under the management and control of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management and control use proper care, it affords reasonable evidence, in the absence of explanation, that the accident is the result of the want of care. The rule is peculiarly applicable to an injury arising from the falling of an elevator."

No good purpose could be served in extending this opinion

by the citation of other authorities. Doubtless, some could be found that would hold contrary to our conclusions in this case, but our conclusions are supported by the great weight of authority and particularly in Ohio.

The second assignment of error is based upon the refusal to give special instruction. No. 3 which was in effect that—

"The mere fact that the accident happened and that the elevator collapsed, is not, in and of itself proof that the defendant was negligent."

Having concluded that the facts of this case justified the application of the doctrine of res ipsa loquitur, it would have been inconsistent to give such charge. The court was correct in refusing to give special request No. 3 to charge before argument.

We have examined the general charge of the court particularly as it related to the subject of proximate cause. The part of the charge complained of was as follows:

"The defendant, the Bereal Hotel Company, would be required to exercise ordinary care in the management, maintenance and control of its elevator, and by ordinary care we mean that degree of care that a person of ordinary care, prudence and caution would exercise under the same or like circumstances; and if the defendant, the Bereal Hotel Company, failed to exercise ordinary care, as the Court has just defined that for you, then that, as a matter of law would be negligence; and if you find, in view of the evidence, and the charge that the Court is giving you, that the defendant was negligent in any respect that, as the Court has said, must be found from the preponderance or greater weight of the evidence, that evidence which is more convincing to the minds of the jury, then you must also find that that negligence, if you find that the defendant was negligent, was the proximate cause of the accident and injuries complained of by the plaintiff."

It is contended that the court told the jury that if they found that the defendant was negligent they must then conclude that such negligence was the proximate cause of plaintiff's injuries. We cannot agree with this interpretation. What the court said was that it was not enough, in order that the plaintiff may recover that he show by a preponderance of the evidence that the defendant was negligent, but before recovery can be had "you must also find that that

negligence, if you find that the defendant was negligent, was the proximate cause of the accident and injuries complained of by the plaintiff."

The charge as given was a correct statement of the law and upon a consideration of the whole record, we find no error prejudicial to the rights of the defendant and the judgment of the Common Pleas Court is therefore affirmed.

HURD, PJ, MONTGOMERY, J, concur.